Filed 3/21/13  P. v. Endsley CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>ANTHONY ENDSLEY,<br><br>    Defendant and Appellant. | F063302<br><br>(Kern Super. Ct. No. BF135033C)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

James Bisnow, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Tia M. Coronado, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Appellant/defendant Anthony Endsley (defendant) and codefendant Shamir Hill were charged with count I, assault by means of force likely to produce great bodily injury (Pen. Code,[1] § 245, subd. (a)(1)), and count II, battery with serious bodily injury (§ 243, subd. (d)); and with the special allegations that the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). They were also charged with count III, the substantive offense of active participation in a criminal street gang (§ 186.22, subd. (a)).

The charges were based on a brutal beating inflicted on Dennis Steward, on or about October 12, 2010. Steward was the boyfriend of Shadonna Hill, sister of both defendant and Shamir Hill. Rodney Woods and a man only known as "RJ" were also present during the beating, but they were not charged or tried in this case.

After a joint jury trial, defendant and Shamir were found not guilty of counts I and II, the assault and battery on Steward, and the gang enhancements were found not true. Shamir was also found not guilty of count III, active participation in a criminal street gang. However, defendant was convicted of active participation and sentenced to the second strike term of 14 years in prison (including enhancements for two prior serious felony convictions).

On appeal, defendant contends that his conviction in count III must be reversed because the court misdirected the jury as to the evidence and requisite elements to prove a violation of section 186.22, subdivision (a), active participation in a criminal street gang, and the court's misdirection was prejudicial because it allowed the jury to convict him solely based on his trial admission that he was a member of a gang, without finding that he willfully promoted, furthered, or assisted "in any felonious criminal conduct by members of that gang" on or about October 12, 2010. (§ 186.22, subd. (a)(1).)

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

As we will explain, the court initially gave the jury the appropriate pattern instructions to define the elements of count III, but it misstated those elements when it responded to the jury's questions about count III. Based on the evidence and nature of the verdicts, we will find that count III must be reversed.

## FACTS

Around 7:00 p.m. on October 11, 2010, Shadonna Leah Hill (Shadonna) and her young child went to a friend's apartment to celebrate Shadonna's birthday.[2] Dennis Steward, Shadonna's boyfriend, met her at the friend's apartment. There were other people at the gathering, and they socialized and drank alcohol.

**Shadonna and her family**

Around 9:00 p.m., Shadonna received a call from her brother, codefendant Shamir Hill (Shamir), who was looking for her.[3] Shadonna told Shamir her location. Shortly afterwards, Shamir arrived at the gathering with Shadonna's adoptive brother, defendant Anthony Endsley; their friend, Rodney Woods; and a girl known as "LaJoy."

Shadonna testified that Steward had previously met both defendant and Shamir, and there were never any problems between them. Shadonna knew Woods because they had been in a dating relationship three or four years earlier. Woods, defendant, and Shamir were good friends. Shadonna testified that Steward knew about her prior relationship with Woods.[4] Shadonna's brothers arrived at the party with another man who Shadonna had never met, later identified as RJ.

---

[2] We will refer to some of the parties by their first names for clarity; no disrespect is intended.

[3] At trial, Shadonna, the prosecution's chief witness, admitted she had prior convictions for theft, she was on probation, and she had been informed she could lose AFDC or be sent to jail if she failed to comply with a subpoena to appear.

[4] Shadonna testified she was in a relationship with Steward even though he was married. She told her brothers that she was in relationship with Steward, but she did not tell them that Steward was married. Steward testified that he knew about Shadonna's

As the evening continued, Shamir and defendant left the apartment with Woods and LaJoy. They were driving their mother's blue-on-blue SUV. Shamir and defendant returned with Woods and another girl, "Ashley." Shadonna and defendant left to buy more alcohol and then returned to the party. Shadonna was not aware of any problems between Steward and the other guests.

Around 1:00 a.m., the gathering broke up, and Shadonna said goodbye and hugged defendant and Shamir. Her brothers left in the blue SUV with Woods and Ashley. Shadonna went back to her apartment with her daughter and Steward. Shadonna put her daughter to bed, and then she went outside to say goodbye to Steward.

**The beating**

After leaving the party, Shadonna and Steward stood outside Shadonna's apartment and said goodbye. The blue SUV arrived with defendant, Shamir, Woods, Ashley, and RJ. The blue SUV parked behind Steward's vehicle and everyone got out. Shadonna did not know RJ, but recognized him and realized he had been at the party earlier that evening with defendant and Shamir.

Shadonna testified that Woods said, " '[W]hat's up[?]' " to Steward. RJ then "sucker punched" Steward in the right jaw. Steward stumbled and fell down. Shadonna tried to shield Steward from further blows and fell down with him. Steward landed on his back, and Shadonna got on top of him to protect him.

Shadonna testified that she repeatedly asked, "[W]hy is this happening, what's going on[?]" Defendant and Shamir yanked her hair and clothing, and tried to pull her off Steward. Shadonna screamed for help and held onto Steward. She told the others to " 'please stop,' " and tried to fight them off. Someone kicked her, and Shamir told her: " '[G]et up bitch.' " She did not see any blood on Steward at this time.

prior relationship with Woods, and Shamir had told him that Steward was a good influence on Shadonna.

4.

Shadonna testified that defendant and Shamir dragged her off Steward. A shank of her hair was pulled out, her clothes were torn, and she suffered scrapes on her leg.

Shadonna testified that defendant and Shamir repeatedly punched Steward in the face. Defendant and Shamir dragged Steward toward the garage, and Shadonna ran to her apartment. She asked Ashley to help Steward, but Ashley did not respond. Shadonna went into her apartment, locked the door, and called 911. She could hear loud, booming noises and believed the men were punching Steward against the garage door. Shadonna believed he was "too drunk to fight back."

Shadonna saw the blue SUV drive away, and she returned outside while still on the line with 911. Steward was on the ground, bloody and mumbling. Emergency personnel arrived and treated Steward.

**The neighbor**

John Olivares lived near Shadonna's apartment. On the night of the assault, he was awakened by the sounds of yelling and screaming. He also heard something banging against metal. He looked out the window and recognized Shadonna. He also saw three or four men beating another man against the garage door. It was too dark to see their faces. Shadonna was screaming at the men to stop beating the victim. Another woman was also present.

Olivares testified that one man beat the victim "pretty bad," the second man beat the victim "nonstop," and the other two men also participated in the beating. At some point, "[a] couple of the other guys went over" and told the primary assailant "to stop and he just did not stop." The other men did not try to pull the primary assailant away from the victim, and the beating continued.

Olivares testified the assailants repeatedly picked up the victim and threw him against a metal trash dumpster. The victim hit the dumpster and slumped to the ground, and the assailants picked him up and again threw him against the dumpster. Olivares called 911 and told them to hurry.

5.

Oliveras testified that when the assailants left, Shadonna returned outside and was holding a phone. Olivares testified the victim was lying on the ground and there was a lot of blood on him.

**Steward's testimony**

Dennis Steward testified that he became very intoxicated at Shadonna's birthday gathering. However, he did not have any conflicts with Shadonna, defendant, Shamir, or Woods that evening. Steward testified that he remembered returning to Shadonna's apartment and standing outside to say goodbye. He also remembered that defendant, Shamir, and the other men arrived in a blue SUV. He thought that Shamir was text messaging on his cell phone. Steward testified that someone punched him in the right side of his jaw, and he fell down. He did not see who hit him. Steward did not remember that Shadonna tried to protect him, or the additional beating that occurred against the garage door.

Steward testified his next memory was that he was lying on the ground, with his back against the garage, as firefighters were trying to help him. He later woke up at the hospital as he was being treated for his injuries.

**The initial investigation**

At approximately 1:15 a.m., Bakersfield Police Officer Mark Calvillo arrived at Shadonna's apartment and found Steward lying on the ground, against the garage. He had multiple facial injuries. There was blood on the garage door. Shadonna was crying and emotional as she described the assault.

Shadonna told Officer Calvillo that defendant, Shamir, Woods, and another man arrived at her apartment; the unidentified man punched Steward; she tried to protect Steward; she was pulled off Steward; and the four men dragged Steward to the garage area and beat him. Shadonna said she had been at a party earlier that evening and had been drinking with the same four men. Officer Calvillo did not receive any reports that gang language or slurs were used during the beating.

6.

**Steward's statement at the hospital**

Around 2:20 a.m., Officer Jeff Martin spoke to Steward in the emergency room. Steward was intoxicated. Steward said he was assaulted by defendant and Shamir. He knew he was punched, but he did not know how many times.[5]

About 30 minutes later, police officers conducted a traffic stop of the blue SUV. Woods was driving, and the passengers were defendant, Shamir, Ashley, and another female. Shamir was intoxicated. Officer Brent Stratton searched the vehicle, and he did not see any blood.[6] Stratton did not notice any injuries to the hands of either defendant or Shamir to indicate they had been in a fistfight.

**Further investigation**

Steward was in the hospital for one week. He suffered a fractured jaw, and had a surgery where a plate was inserted under both eyes in his right temple area. He had scars under both eyes from the surgery, and a scar on the right side of his neck, from his ear to the chin. His eyesight was never the same after the beating.

On November 5, 2010, Detective Clayton Madden interviewed Shadonna about the assault. Shadonna stated that an unidentified man punched Steward, and he fell down. Defendant and Shamir also punched Steward, and she yelled at them to stop. Shadonna further stated that Shamir replied: "[S]hut up, bitch, and just get off me. I'm an Eastside Crip and I'm going to hit you." This interview was the first time that Shadonna mentioned anything about a gang.

Shadonna said that Shamir was the person who primarily kicked and punched Steward. Shadonna also said that earlier that evening, during the gathering at her friend's apartment, Steward said he had been in a conversation with Woods about his prior relationship with Shadonna.

---

[5] Steward testified he did not remember speaking to an officer at the hospital.

[6] At trial, Shadonna testified that about a month after the incident, she saw blood inside the blue SUV.

Detective Madden separately interviewed Steward, who said someone hit him on the right side of his face. Steward knew that he fell down against the garage, but he could not remember anything after that. Steward said he never had any prior problems with Shamir or Woods. He had never met defendant before that night.

At some point just before trial, Shadonna's mother received a letter which asked her to deliver an enclosed note to Shadonna. She gave the note to her grandson, who gave it to Shadonna.[7]

## OFFICER ALEMAN'S TESTIMONY

Officer Isaac Aleman testified as the prosecution's gang expert. Aleman was part of the police department's unit that handled gang investigations. He had daily contact with gang members in Bakersfield. He had spoken to more than 15 members of the Eastside Crips (ESC) during the previous six months, and between 80 to 100 suspected gang members during his time in the gang unit. Aleman had testified as an expert on one previous occasion – at the preliminary hearing in this case. The instant trial was the first time he had testified as an expert in front of a jury. Aleman testified that he relied on information from other gang members when he formed his opinions about the ESC and the defendants in this case.

Officer Aleman testified that the ESC were a criminal street gang, and he had investigated their primary activities, which included shootings, murders, burglaries, assaults with deadly weapons, robberies, carjackings, narcotics sales and narcotics possession, primarily cocaine base. The ESC was a Sureno gang and claimed the color blue.

---

[7] The letter to Shadonna was purportedly written by Shamir and asked her to match her story with the story in the letter – that Shadonna went along with what the police and Steward wanted her to say because she was angry, and that she should testify that Shamir tried to stop RJ and Woods from beating up Steward.

Officer Aleman testified about two predicate offenses committed by other members of the ESC: in July 2009, two members of the ESC were convicted of armed robbery and gang charges; and in May 2010, a member of the ESC was convicted of possession of marijuana for sale. Neither defendant nor Shamir were involved in these two offenses.

Officer Aleman testified to his opinion that Shamir was an active member of the ESC: Shamir claimed ESC when he was booked into jail in this case, in October 2010; there were records of multiple police contacts when he was with other members of ESC; he was identified by other gang members as also being a member of ESC; and in 2005, he was shot at by unknown subjects within ESC territory. Shamir's gang moniker was "Project Bar" or "Big Bar."

Officer Aleman also testified to his opinion that defendant was an active member of the ESC: defendant claimed ESC membership when he had been booked into jail on five prior occasions, including on this case in October 2010; in September 2006, he was stopped by police and admitted to being a member of the 11th Street Project Crips, a subset of the ESC; in August 2006, he was in a car with other known members of the ESC, and the car attempted to evade officers; he had been detained during incidents while with other known members of the ESC; in May 2005, defendant and another person were shot while they were in the territory of the rival Westside Crips, and defendant told the police that they were shot because of the gang rivalry. Defendant's gang moniker was "Lil Ant."

Officer Aleman had no information as to whether Rodney Woods or RJ were members of ESC or any other gang. Aleman testified that if the police had information that a person had dropped out of a gang, then that information would be kept in the records, along with information about that person's prior gang contacts.

9.

Officer Aleman testified that Shadonna's apartment was within the disputed territory of the ESC, based on ESC graffiti on a garbage dumpster near her apartment. He did not know who sprayed the graffiti on that dumpster or when it happened.

Based on a hypothetical question, Officer Aleman testified to his opinion that if two members of the ESC assaulted someone within ESC territory, and one of them called out the word "Eastside Crip," then the assault would have been committed for the benefit of the ESC, because it would spread fear and intimidation around the community.

On cross-examination, the defense attorneys for both defendant and Shamir asked Officer Aleman a variation on the prosecution's hypothetical question: whether the assault would still be gang-related if none of the parties said anything about ESC, or if none of the parties were members of any gang. Aleman testified that under those circumstances, the assault would not appear gang-related without further investigation. Aleman further testified that if two gang members were just standing around and not participating in the assault, then it was not a gang-related offense. Aleman further conceded that not every crime committed by one or more gang members was a gang-related offense, and it depended on the circumstance of each crime.

## DEFENDANT'S TESTIMONY

Defendant testified that he went to the gathering for Shadonna's birthday with Shamir, Rodney Woods, and LaJoy. They drank and visited, and everyone got along. Defendant testified it was the first time he met Dennis Steward, and there were no problems between them.

Defendant testified he left the party with Shamir and Woods. They dropped off LaJoy, and then returned with Ashley. Everyone was still drinking. Defendant testified that Woods and Steward exchanged words and had some type of disagreement, based on Shadonna's prior relationship with Woods. Defendant "neutralized" the situation, and Woods and Steward shook hands.

10.

Defendant testified he left the party with Shamir and Ashley; Woods stayed at the party. Defendant and Shamir picked up RJ, who was Ashley's brother and a good friend of Woods. Defendant and the others returned to the party.

Defendant testified he eventually left the party with Shamir, Woods, Ashley, and RJ. Defendant admitted he was drunk, but he thought Shamir was sober because he was their "designated driver." They bought more alcohol and headed to Shadonna's apartment because they had agreed to continue the party there.

Defendant testified that when they arrived at Shadonna's apartment, Shadonna and Steward were arguing in the driveway. Defendant and his friends got out of the car. Shadonna walked up to Woods, and she was "ranting and raving" at him, " '[W]hat did you tell him …?' "

Defendant testified that Steward and Woods started to argue about Woods's prior relationship with Shadonna. Shadonna got in the middle of the argument, and Shamir tried to "alleviate" the situation. Steward was "very" drunk.

Defendant testified that RJ "blind side[ed]" Steward, and hit him in the face with a solid punch. Steward fell to the ground. Defendant grabbed RJ and asked what he was doing because he did not know Steward. Defendant was "tusseling" with RJ. Defendant believed someone might have pushed Shadonna down.

Defendant testified that Steward got up, and a fist fight occurred between Steward and Woods. Woods again punched Steward, and Steward fell back against the garage. Woods and Steward continued to fight, but Woods got the better of the altercation because he was younger than Steward.

As Woods and Steward were fighting, defendant did not intervene, and he held back RJ from getting into the middle of the fight, "because that's like a quarrel between two men … a mutual combat fight. That's just something that usually happens." Defendant saw Woods punch Steward three or four times while Steward was on the ground by the garbage dumpster. Defendant thought Shamir took Shadonna into her

11.

apartment during the fight. He never saw Shamir punch Steward. He never saw anyone throw Steward against the garage.

After the fight was over, defendant left with Shamir, Woods, and RJ. Defendant admitted that he saw Steward lying by the garbage dumpster. He did not see any blood, and he did not realize that Steward was hurt. Defendant insisted that he would have stayed and helped Steward if he realized that he was hurt, but defendant was very drunk, and it was too dark to see what had happened.

On cross-examination, defendant admitted he had a tattoo of a man's hand holding a .40-caliber gun. He also had a tattoo which said: "11," which stood for "11th Street" on the east side. Defendant admitted it was a gang tattoo, and that the East 11th Street Project Crips was a subset of the ESC. Defendant denied that he claimed ESC when he was booked into jail for this case in October 2010.

Defendant admitted he had prior felony convictions in 2005 for being in a stolen vehicle and leading officers on a traffic pursuit and for active participation in a criminal street gang. Defendant admitted he was shot in 2005, but denied that he said he was shot by a rival gang member for being in the territory of the Westside Crips. In 2007, he was convicted of a felony of moral turpitude, and he ran away from the police while carrying a loaded .380-caliber handgun.

Defendant testified that at the time of this case, he was not supposed to be hanging around gang members because it would violate his parole, but "I can't see who was a gang member in this situation other than me." Defendant testified he was not with any gang members that night. Defendant further testified that he was not a gang member anymore. "I'm not involved with that life anymore. And a man getting beat up like that, yes, I would stay to help him. I don't care if my friend did it.… It doesn't really matter. I would have helped him."

12.

## PROCEDURAL HISTORY

### The charges

As noted *ante*, defendant and Shamir were jointly tried before the same jury for count I, assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)), and count II, battery with serious bodily injury (§ 243, subd. (d)(2)), with the gang enhancement alleged as to counts I and II; and count III, active participation in a criminal street gang (§ 186.22, subd. (a)), with all offenses based on the beating of Steward.

Rodney Woods and RJ were not charged in this case and did not appear as witnesses.[8]

As we will explain, Shamir was found not guilty of all charges. Defendant was found not guilty of counts I and II, the assault on Steward; but he was convicted of count III, active participation in a criminal street gang.

### The instructions

On appeal, defendant challenges the validity of his conviction in count III, the substantive gang offense (§ 186.22, subd. (a)), and contends the court improperly responded to the jury's questions about the elements of that offense, contrary to the correct definitions provided in the pattern instructions. We will thus focus on the procedural aspects of defendant's jury trial which relate to count III.

The jury was instructed that the defendant and Shamir could be guilty of the charged offenses as either direct perpetrators or aiders and abettors. (CALCRIM Nos. 400, 401.) The jury was also instructed not to speculate as to why Rodney Woods was not charged in the case (CALCRIM No. 206); that other perpetrators may have been involved in the offenses, and the jury could not speculate on why the other perpetrators

---

[8] According to the probation report, Woods was separately arraigned on charges based on the assault on Steward while this case was proceeding to trial.

were not charged as codefendants (CALCRIM No. 373); and that the crimes were alleged to have occurred on or about October 12, 2010. (CALCRIM No. 207.)

The jury was instructed on the elements of counts I and II, and the gang enhancements alleged as to those two counts. The gang enhancement instruction defined the elements of a criminal street gang, primary activities, and predicate offenses. (CALCRIM No. 1401.)

As to count III, the jury was separately instructed with CALCRIM No. 1400, the elements of the substantive gang offense of active participation in a criminal street gang, in violation of section 186.22, subdivision (a), as follows.[9]

> "To prove that the defendant is guilty of this crime the People must prove that, one, the defendant actively participated in a criminal street gang; two, when the defendant participated in the gang, he knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; and *three, the defendant willfully assisted, furthered, or promoted felonious criminal conduct by gang members either by, A, directly and actively committing a felony offense, or, B, aiding and abetting a felony offense.*
>
> "Active participation means involvement with a criminal street gang in a way that is more than passive or in name only.
>
> "The People do not have to prove that the defendant devoted all or a substantial part of his or her time or efforts to the gang or that he was an actual member of the gang.
>
> "A criminal street gang is defined in another instruction from which you should refer.

---

**9** As we will explain, *post*, CALCRIM No. 1400 correctly stated that the "felonious criminal conduct" required to convict defendant of count III, the substantive gang offense, was based on the assault and battery on Steward. Defendant does not challenge the accuracy or validity of the pattern instructions given for count III. Instead, defendant challenges the court's response to the jury's questions during deliberations about count III, and contends the court misdirected the jury when it stated that defendant could be guilty of count III, the substantive gang offense, even if the jury acquitted him of the assault and battery charges.

14.

"As the term is used here, a willful act is one done wilfully or on purpose.

*"Felonious criminal conduct means committing or attempting to commit any of the following crimes: Assault with force likely to produce great bodily injury, battery causing serious bodily injury.*

"To decide whether a member of the gang or defendant committed the felonies listed, immediately – please refer to the separate instructions that I've given you on those crimes.

*"To prove that the defendant aided and abetted felonious criminal conduct by a member of the gang, the People must prove that, one, a member of the gang committed the crime; two, the defendant knew that the gang member intended to commit the crime; three, before or during the commission of the crime the defendant intended to aid and abet the gang member in committing the crime; and four, the defendant's words or comments did, in fact, aid and abet the commission of the crime.*

"Someone aids and abets a crime if he or she knows the perpetrator's unlawful purpose and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor.

"However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not by itself make him or her an aider and abettor.…" (Italics added.)

The jury also received CALCRIM No. 1403:

"You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crime enhancements charged or the defendant had a motive to commit the crimes charged.

"You may also consider this evidence when you evaluate the credibility or the believability of a witness and whether you consider the facts and information relied on by an expert witness in reaching his or her opinion.

15.

"You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he had a disposition to commit any crime."

## Closing arguments about count III

In closing argument, the prosecutor argued there was "no question" that both defendant and Shamir were active members of the ESC, based on Officer Aleman's testimony about their prior contacts with law enforcement. In addition, defendant claimed ESC when he was booked in this case, and he testified that he was a member of the 11th Street Project Crips, a subset of the ESC. Steward was beaten in an area where there was ESC graffiti.

"This was a group beating by more than one Eastside Crip gang members, the defendants, on a vulnerable 59-year-old man [Steward] in territory right there at the apartments were the graffiti of the gang is located."

Defendant's attorney argued that RJ and Woods fought with Steward because of his relationship with Shadonna; there was no evidence that defendant punched or assaulted Steward; and defendant tried to stop the fight and held back RJ. Defense counsel argued there was no evidence that the assault was gang-related. Defense counsel further argued that Shadonna gave various accounts of the events leading to the assault, including how much alcohol she consumed that night. Shadonna never said anything about a gang or the ESC until much later in the investigation.

In rebuttal argument, the prosecutor addressed the elements of count III, active participation in a criminal street gang. He explained that CJIS reports were documentary exhibits to establish the predicate offenses and prove the ESC was a criminal street gang.

"… [Count III] … does not require gang-related activity. All it is is that the defendants are active participants in a criminal street gang with knowledge of the ongoing pattern of criminal conduct *and that they commit any felony.*

16.

*They directly commit any felony. Which is the beating in this case.*"
(Italics added.)[10]

## The jury's first question

At 11:45 a.m. on June 28, 2011, the jury began deliberations.

At 2:43 p.m. the jury sent a note to the court, asking whether there were duplicate verdict forms for defendant on the charged offenses. At 3:08 p.m., the court responded in writing that the forms were not duplicates, but lesser included offenses of counts I and II.

## The jury's second and third questions

At 3:16 p.m. on June 28, 2011, the jury asked for a reading of all of defendant's testimony.

At 3:47 p.m., before the court responded to the question about defendant's testimony, the jury sent another note to the court.

"Is Count 3 a separate charge[;] separate from the accounts [*sic*] for
11 October 2010 separate from the assault charges?"

The court advised the prosecutor and defense attorneys that when the foreperson handed the note about count III to the bailiff, the foreperson said "that based on the readback of [defendant's] testimony, [that] might mitigate the third question about Count 3." The court suggested that the jury should hear defendant's testimony, and then the court would "ask them what they want to do with the note about [defendant]." Neither defendant objected.

The court recalled the jury into the courtroom, and stated that it had received the request to hear defendant's testimony. "And then we received another [note] a little bit later, although my understanding is based on the readback, that might mitigate the third question." The foreperson replied that was correct.

---

**10** Defendant does not challenge the accuracy of the prosecutor's summation about count III, that the "felonious criminal conduct" required to convict defendant of the substantive gang offense was the assault and battery on Steward.

17.

The court noted that it was almost the end of the day. It directed the reporter to read defendant's testimony to the jury, and then advised the foreperson to "let me know tomorrow morning at nine o'clock how you wish to proceed. Okay? If you want that other information or not." The foreperson agreed.

**The court's response to the jury's question about count III.**

At 9:55 a.m. on June 29, 2011, the court called the jury into the courtroom and addressed the previous day's question about count III.[11]

> "We received a note yesterday afternoon, which reads is Count 3 a separate charge, separate from the accounts [*sic*] for 11 October 2010, separate from the assault charges?
>
> "Let me go through this one at a time and – if I can.
>
> "Is Count 3 a separate charge? Yes.
>
> "Basically Counts 1 and 2 are the assault charges, all right? So you have to determine whether or not the prosecution has met their burden of proving the assault charges in Counts 1 and 2.
>
> "Count 3 then asks you on October the 11th or 12th, whichever – on or about that day, did they meet the requirements, the prosecution, of proving to you that these fellas met the elements of being – promoting, furthering, assisting the gang. Okay?
>
> *"Really, that's a separate charge from the assault. You can, for the sake of argument, just assuming arguendo, find they had nothing to do with assault charges in Counts 1 and 2 but determine they are gang members on this particular day or not.*
>
> "Do you follow me?
>
> *"It's entirely separate as long as the elements are met or not. It's up to you.*
>
> "But Count 3 is separate from Counts 1 and 2.

---

[11] On appeal, defendant contends the court's response herein was erroneous and misleading as to the elements of count III, the substantive gang offense. The record is silent as to whether the court consulted with the parties before it gave this response.

18.

"Does that answer the question at all?"**[12]**  (Italics added.)

The foreperson asked whether it was "[f]or that day, the 11th, 12th, right around that time?"  The court replied that it was "[o]n or about that day did [the prosecutor] show that the elements are met on that date."

## The jury's fourth question

At 9:25 a.m. on June 29, 2011, almost immediately after the court completed its answer to the prior question, the jury sent another note.  "Why do we have two CJIS [Criminal Justice Information System] reports, People's 18 & 19?  What relationship is this to our defendants?"

At 9:48 a.m., the jury returned into the courtroom, and the court responded to the question.

> "During the course of the trial, these items were entered as what's known as predicate offenses to show – on behalf of the People trying to show the – *the gang allegations require information regarding gang activity and past gang information*.
>
> "Those predicate offenses go to that.
>
> "If you'll look at the jury instruction, it requires that certain things be proven.  And those certain things were proven with those predicate offenses.
>
> "So granted, I believe the names [of the defendants in those cases] were Anthony English and another one.  I can't remember.
>
> "Those are the predicate offenses that help the prosecution show or not show, depending on how you look at it, the information that's required in those jury instructions.
>
> "It has nothing to do with [defendants] Hill and Endsley as it relates to the assault or Count 2.

---

**[12]** As we will explain, *post*, the court's italicized statements were erroneous because "[m]embership alone in a gang is not sufficient to satisfy the requirement of active participation" for a violation of section 186.22, subdivision (a).  (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1509 (*Garcia*).)

19.

"It has to do with the gang information as to whether or not the prosecution can meet all of those elements that are required in that gang instruction.

"Does that help at all?"  (Italics added.)

The jurors responded yes, and they resumed deliberations at 9:57 a.m.

**The jury's fifth question**

At 11:00 a.m. on June 29, 2011, the jury sent the court another question about count III, the substantive gang offense:

"Clarification on Pen. Code 186.22(a)[.]  The 'and' #3 does this only apply to October 10-13 or is his past allowed to be considered[?]"

The reporter's transcript does not reflect whether the court consulted with the parties regarding this question.  However, the court sent the following written response to the jurors, apparently referring to CALCRIM No.1400:

"There are three 'and #3' in the instruction.  Can you be specific as to which one you need clarification on.…"

The record is silent as to whether the jury gave a more specific question.  At 11:20 a.m., the court sent another written response to the jury:

"You can use past history in determining if the defendant met the elements needed for the Oct 12 offense.  Remember to look at each defendant separately and individually.…"[13]

The record is again silent as to whether the court consulted with the parties before it sent this written response to the jury.

**Verdicts**

At 11:34 a.m. on June 29, 2011, the jury advised the court that it had reached a verdict.

---

[13] As we will explain, *post*, defendant claims the court's response was also erroneous and misleading as to the elements of count III, the substantive gang offense.

20.

Defendant and Shamir were found not guilty of counts I and II, the assault and battery on Steward, and the gang enhancements were found not true.

As to count III, active participation in a criminal street gang, defendant was found guilty and Shamir was found not guilty.

**Motion for new trial**

Defendant filed a motion for new trial on his conviction for count III, active participation in a criminal street gang, based on several grounds, including the allegation that the court misdirected the jury when it responded to the two questions about count III, the substantive gang offense. Defendant asserted the court should have clarified the elements of count III when it responded to these two questions, and the court's erroneous responses were prejudicial and resulted in his conviction for count III.

The People's opposition asserted the court correctly responded to the jury's questions.

**The court's denial of the new trial motion**

The court denied defendant's motion for new trial and found that its responses to the jury's questions about count III were appropriate.

> "And the question we received from the jury was question number two that they sent out,… states clarification on Penal Code Section 186.22(a), the, quote, and, end quote, number three, does this only apply to the October 10th through 13th or is his past allowed to be considered?
>
> "And as I recall my answer is yes, his past could be allowed to be considered.… [¶] … [¶] There are – if you'll look at CALCRIM 1400 (*sic*), there are actually two sections in CALCRIM 1300 (*sic*) that have elements 1, 2 and then and, quote, unquote, 3.
>
> "The second one has to do with a common name or common identifying sign or symbol, et cetera.
>
> "That was actually covered in Jury Instruction Number 1401. So we didn't cover that again in 1400.
>
> "*So clearly the jury was referring to the first section of 1400, which states, number one, the defendant actively participated in a criminal street*

21.

*gang; number two, when the defendant participated in the gang, he knew what members of the gang engaged in or have engaged in a pattern of criminal gang activity; and, number three, the defendant willfully assisted, furthered or promoted felonious criminal conduct by members of the gang either by, A, directly and actively committing a felony offense or, B, aiding and abetting a felony offense.*

"So based on that 1400, his past has to be considered and his exposure to and knowledge of the gang to answer question number two, when the defendant participated in a gang he knew that members of the gang engaged in or have engaged in a pattern of criminal gang activity. *And that with that knowledge he aid – actively participated in or aided and abetted the crime on October the 12th.*

"*The jury can certainly find that he aided and abetted based on the testimony.*

"The evidence presented at the trial was that the defendant was a gang member or admitted to being in a gang in the past.

"Both past and present offenses show that defendant's knowledge of the gang and its primary activities and, therefore, falls within the general rule of admissibility." (Italics added.)

## Sentencing

After a bench trial, the court found true the bifurcated special allegations that defendant had two prior strike convictions and two prior serious felony convictions. The court dismissed the prior prison term enhancements for insufficient evidence.

At the sentencing hearing, the court granted defendant's request to dismiss one prior strike conviction. Thereafter, the court sentenced defendant to the midterm of two years, doubled to four years, with two consecutive terms of five years for the two prior serious felony enhancements, for an aggregate term of 14 years.

## THE COURT'S RESPONSES TO THE JURY'S QUESTIONS WERE ERRONEOUS

Defendant contends the court misdirected the jurors in response to their questions about the only charge for which he was convicted in this case: count III, active participation in a criminal street gang. As set forth *ante*, the jury asked several questions

22.

during deliberations, including two questions about count III and the instructions which defined that offense. Defendant contends the court's responses were erroneous because the responses misstated the elements of count III. Defendant further contends that the court's erroneous responses were prejudicial because the jury acquitted him of the assault and battery of Steward, but convicted him of active participation in a criminal street gang solely based on his trial admission that he had been a member of the ESC, without having to find the requisite "felonious criminal conduct."

A. **The court's duty to respond to jury questions/ineffective assistance**

"The trial court has a duty to help the jury understand the legal principles the jury is asked to apply. [Citation.] In particular, under section 1138 the court must attempt 'to clear up any instructional confusion expressed by the jury.' [Citation.] But 'this does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.' [Citations.] In exercising that discretion, the trial court 'must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given.' [Citations.]" (*People v. Giardino* (2000) 82 Cal.App.4th 454, 465, italics in original.)

Under such circumstances, the trial court may be " 'understandably reluctant to strike out on its own. But a court must do more than figuratively throw up its hands and tell the jury it cannot help.' [Citation.]" (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1015.) An error under section 1138 does not require reversal unless defendant can establish prejudice under *People v. Watson* (1956) 46 Cal.2d 818, that it is reasonably probable he would have obtained a more favorable result, i.e., acquittal of the charged offense, if the court's failure to properly respond to the jury's question had not occurred. (*People v. Solis*, *supra*, 90 Cal.App.4th at p. 1015.)

23.

However, a defendant's failure to object to the court's proposed or actual response to a jury's question waives any objection under section 1138. (*People v. Roldan* (2005) 35 Cal.4th 646, 729, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) The failure to object to the trial court's response to a jury's inquiry "should bar defendant from contending on appeal that a more elaborate response should have been made. If defendant desired such a response, he should have proposed it. [Citations.]" (*People v. Medina* (1990) 51 Cal.3d 870, 902; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193.)

Defendant acknowledges that the record is silent as to whether defense counsel objected to the court's responses to the jury's two questions about count III. Defense counsel was present when the court verbally responded to the jury's initial question about count III, and he did not object. The court gave a written response to the jury's second question about count III. The record is silent as to whether the court advised defense counsel about its proposed written response, but defense counsel never lodged an objection either before or after the jury received the response.

In light of this record, defendant alternatively contends that to the extent defense counsel failed to object to the court's responses, counsel was prejudicially ineffective. "To establish ineffective assistance, defendant bears the burden of showing, first, that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms. Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to him. [Citations.]" (*People v. Hawkins* (1995) 10 Cal.4th 920, 940, overruled on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110 and *People v. Blakeley* (2000) 23 Cal.4th 82, 89.)

We will thus examine the merits of defendant's contentions that the court misdirected the jury when it responded to the two questions about count III.

24.

**B.** **Section 186.22, subdivision (a)**

Defendant was charged and convicted in count III of the substantive offense of active participation in a criminal street gang, in violation of section 186.22, subdivision (a), which was enacted as part of the California Street Terrorism Enforcement and Prevention (STEP) Act. (§ 186.20 et seq.) Section 186.22, subdivision (a) punishes "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang,..."

"The substantive offense defined in section 186.22(a) has three elements. Active participation in a criminal street gang, in the sense of participation that is more than nominal or passive, is the first element of the substantive offense defined in section 186.22(a). The second element is 'knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity,' and the third element is that the person 'willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang.' [Citation.]" (*People v. Lamas* (2007) 42 Cal.4th 516, 523, brackets in original.)

As to the third element, section 186.22, subdivision (a) does not require that the "felonious conduct" that is willfully promoted, furthered, or assisted be gang related. (*People v. Albillar* (2010) 51 Cal.4th 47, 55 (*Albillar*).) The California Supreme Court has concluded that the plain, unambiguous language of section 186.22, subdivision (a) targets *any* felonious criminal conduct, not felonious gang-related conduct. (*Albillar*, *supra*, at p. 55.)

However, "[i]t is not enough that a defendant have actively participated in a criminal street gang at any point in time .… A defendant's active participation must be shown at or reasonably near the time of the crime. Section 186.22, subdivision (a) uses

25.

the present tense – 'actively *participates*' ….." (*Garcia*, *supra*, 153 Cal.App.4th at p. 1509, italics added in original.)

Moreover, "active participation" is "involvement with a criminal street gang that is more than nominal or passive." (*People v. Castenada* (2000) 23 Cal.4th 743, 747 (*Castenada*).) The STEP Act "does not criminalize mere gang membership; rather, it imposes increased criminal penalties only when the criminal conduct is felonious" in the case of the substantive offense, and "committed not only 'for the benefit of, at the direction of, or in association with' a group that meets the specific statutory conditions of a 'criminal street gang,' but also with the 'specific intent to promote, further, or assist in any criminal conduct by gang members,' [citation.]" in the case of the gang enhancement. (*People v. Gardeley* (1996) 14 Cal.4th 605, 623-624.)

"[M]embership alone in a gang is not sufficient to satisfy the requirement of active participation" for a violation of section 186.22, subdivision (a). (*Garcia*, *supra*, 153 Cal.App.4th 1499, 1509.) The California Supreme Court has explained that *"[m]ere active and knowing participation in a criminal street gang is not a crime*. Applying the third element of section 186.22(a), a defendant may be convicted of the crime of gang participation only if he also willfully does an act that 'promotes, furthers, or assists in any felonious criminal conduct by members of that gang.' (§ 186.22(a).)" (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130-1131 (*Rodriguez*).)

In considering the STEP Act, "the Legislature was careful to observe that '*mere membership [in a gang] is not punishable under the bill*. The United States Supreme Court has held that mere association with a group cannot be punished unless there is proof that the defendant knows of and intends to further its illegal aims. [Citation.] This bill imposes sanctions on active participation in the gang only when the defendant knows about and specifically intends to further the criminal activity; or where he knows of the criminal activity and willfully promotes, furthers, or assists it.' [Citation.]" (*People v. Mesa* (2012) 54 Cal.4th 191, 196-197, italics added, first brackets in original.) The

26.

Legislature thus attempted to "avoid any potential due process concerns that might be raised by punishing mere gang membership." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1133, fn. omitted.)

### 1. *Castenada* **and** *Rodriguez*

The California Supreme Court has clarified these aspects of section 186.22, subdivision (a) in two noteworthy cases. In *Castenada,* the court addressed the first element of section 186.22, subdivision (a), as to what constitutes active gang participation. *Castenada* held that someone who " 'actively participates in any criminal street gang' " need not be a leader in that gang as long as the person's involvement "is more than nominal or passive." (*Castenada*, *supra*, 23 Cal.4th at p. 747.) When the Legislature enacted section 186.22, subdivision (a), "it was fully cognizant of the guilty knowledge and intent requirements" which the United States Supreme Court had previously articulated in *Scales v. United States* (1961) 367 U.S. 203 (*Scales*). (*Castaneda*, *supra*, at p. 749.)[14]

---

[14] In *Scales*, the United States Supreme Court addressed the constitutionality of the membership clause of the Smith Act, which criminalized membership in any organization advocating the overthrow of the government by force or violence. In addressing a due process challenge to this provision, *Scales* stated: "In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity (here advocacy of violent overthrow), *that relationship must be sufficiently substantial* to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment.…" (*Scales, supra,* 367 U.S. at pp. 224-225, italics added.) *Scales* concluded that, without more, mere membership in an organization engaged in illegal conduct is not sufficient to establish the required relationship between that membership status and criminal activity. *Scales* ultimately held the statute passed constitutional muster when it was interpreted "to reach only 'active' members having also a guilty knowledge and intent, and which therefore prevents a conviction on what otherwise might be regarded as merely an expression of sympathy with the alleged criminal enterprise, unaccompanied by any significant action in its support or any commitment to undertake such action." (*Id.* at p. 228.)

*Castenada* explained that when the Legislature enacted section 186.22, subdivision (a), it relied on *Scales* and limited "liability to those who promote, further, or assist a specific felony committed by gang members and who know of the gang's pattern of criminal gang activity. Thus, a person who violates section 186.22(a) has also aided and abetted a separate felony offense committed by gang members,..." (*Castenada, supra*, 23 Cal.4th at p. 749.) *Castenada* noted that "[t]hese statutory elements necessary to prove a violation of section 186.22(a) exceed the due process requirement of personal guilt that the United States Supreme Court articulated in *Scales*,..." (*Castenada*, *supra*, 23 Cal.4th at p. 749.)

*Castenada* "thus rejected the defendant's claim that section 186.22(a) criminalized lawful association since the statute required that 'a defendant "actively participate[ ]" in a criminal street gang while also aiding and abetting a felony offense committed by the gang's members.' [Citation.]" (*Rodriguez*, *supra*, 55 Cal.4th at p. 1134.)

In *Rodriguez*, the court held that the third element required to prove the substantive gang offense – that the person "willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang" – cannot be satisfied when a gang member commits a felony while acting alone. (*Rodriguez*, *supra*, 55 Cal.4th at p. 1128.) Section 186.22, subdivision (a) "reflects the Legislature's carefully structured endeavor to punish active participants for commission of criminal acts done *collectively* with gang members." (*Rodriguez*, *supra*, at p. 1153, italics in original.)

In reaching this conclusion, *Rodriguez* found it "significant" that section 186.22, subdivision (a) required a defendant "to promote, further, or assist *members* of the gang." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1131, italics in original.)

> "Section 186.22(a) speaks of 'criminal conduct by *members* of that gang....' [] '[M]embers' is a plural noun. The words 'promotes, furthers, or assists' are the verbs describing the defendant's acts, which must be performed willfully. The phrase 'any felonious criminal conduct' is the direct object of these verbs. The prepositional phrase 'by members of that gang' indicates who performs the felonious criminal conduct. Therefore, to

28.

satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct. *The plain meaning of section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member.* (See § 186.22, subd. (i).)" (*Id.* at p. 1132, first italics in original, second italics added.)

*Rodriguez* found that such an interpretation was consistent with the Legislature's attempt to avoid due process concerns when it drafted section 186.22, subdivision (a).

"*The Legislature thus recognized the constitutional prohibition against punishing mere gang membership*, and its use of the plural 'members' in section 186.22(a) reflected the Legislature's attempt to provide a nexus between the felonious conduct and gang activity that avoided the concerns raised in *Scales*. [Citation.] The Attorney General's interpretation that a gang member may satisfy the statute simply by committing a felony alone *reads out of the statute the nexus between defendant's conduct and gang activity that the Legislature put in the statute by requiring one act with another gang member.*" (*Rodriguez*, *supra*, 55 Cal.4th, at p. 1135, italics added.)

"The Legislature thus sought to avoid punishing mere gang membership in section 186.22(a) by requiring that a person commit an underlying felony with at least one other gang member. *Scales* found the membership provision of the Smith Act constitutional because it criminalized 'active' membership coupled with knowledge of the organization's criminal goals and the specific intent that such goals be furthered. In this context, *Scales* stated, 'we can perceive no reason why one who actively and knowingly works in the ranks of that organization, intending to contribute to the success of those specifically illegal activities, should be any more immune from prosecution than he to whom the organization has assigned the task of carrying out the substantive criminal act.' [Citation.] As we observed in *Albillar,* however, section 186.22(a), unlike the gang enhancement in section 186.22(b)(1), does not require a specific intent to further or promote the gang (only knowledge of the gang's pattern of criminal activity). [Citation.] Further, as previously noted, *Albillar* concluded section 186.22(a) does not require that the underlying felony be gang related. [Citation.]" (*Rodriguez*, *supra*, 55 Cal.4th at p. 1134-1135.)

"Section 186.22(a) and section 186.22(b)(1) strike at different things.  The enhancement under section 186.22(b)(1) punishes gang-related conduct, i.e., felonies committed with the specific intent to benefit, further, or promote the gang.  [Citation.]  However, '[n]ot every crime committed by gang members is related to a gang.'  [Citation.]  As such, with section 186.22(a), the Legislature sought to punish gang members who acted *in concert* with other gang members in committing a felony regardless of whether such felony was gang related.  [Citation.]"  (*Id*. at p. 1138, italics in original.)

*Rodriguez* thus concluded that the defendant in that case, who was a gang member but acted alone when he committed an attempted robbery, could not be guilty of active participation in a criminal street gang in violation of section 186.22, subdivision (a).  (*Rodriguez*, *supra*, 55 Cal.4th at pp. 1138-1139.)

## C.    Analysis

As applied to the instant case, the pattern instructions initially given to the jury correctly stated the applicable law and requisite elements to prove count III, the substantive offense of active participation in a criminal street gang in violation of section 186.22, subdivision (a).  CALCRIM No. 1400 defined the three elements of the offense, and correctly stated that the third element – that defendant willfully assisted, furthered, or promoted felonious criminal conduct by gang members – could be satisfied either by his direct commission of a felony or by aiding and abetting a felony offense.

CALCRIM No. 1400 further stated that "[f]elonious criminal conduct means committing or attempting to commit any of the following crimes:  Assault with force likely to cause great bodily injury, battery causing serious bodily injury."  These were the two offenses charged against defendant and Shamir in counts I and II, based on the beating of Dennis Steward.

Finally, the jury was instructed as to all three counts that defendant and Shamir could be guilty as either direct perpetrators or as aiders and abettors, and that the jury could not consider why Rodney Woods or other alleged perpetrators were not joined in this case.

The pattern instructions thus correctly set forth the applicable law for the charged offenses. However, the court's responses to the jury's questions about count III undermined these instructions and misdirected the jury as to the prosecution's burden of proving defendant's guilt for count III, active participation in a criminal street gang. The jury initially asked to hear the entirety of defendant's trial testimony, and then asked for clarification about whether the assault and battery charges were separate from count III, the substantive gang offense. The foreperson indicated that the jury might resolve its problem upon rehearing defendant's testimony, but the trial court apparently believed it had to respond to the question after the testimony was read to them.

When the court sought to respond to the jury's question about whether the assault and battery charges were separate from the substantive gang offense, it correctly stated that the charges were separate. However, the court then continued with its answer and incorrectly stated that the jury could find defendant and Shamir "had nothing to do" with the assault and battery against Steward "but determine they are gang members on this particular day," as charged in count III. The foreperson asked for further clarification about whether count III was based on the day of the assault, October 11 or 12, 2010, and the court replied: "On or about that day did [the prosecutor] show that the elements are met on that date."

The court's response was erroneous. As we have explained, section 186.22, subdivision (a) does not criminalize mere gang membership, and "membership alone in a particular gang is not sufficient to satisfy the requirement of active participation." (*Garcia*, *supra*, 153 Cal.App.4th at p. 1509; *Gardeley*, *supra*, 14 Cal.4th at p. 623; *Castenada*, *supra*, 23 Cal.4th at p. 747.)

The court's response might not have been prejudicial except for the nature of the jury's verdicts in this case. Defendant and Shamir were charged with the assault and battery of Steward. The instructions correctly stated that the felonious criminal conduct required to prove a violation of section 186.22, subdivision (a), was based on the

31.

commission or attempted commission of "[a]ssault with force likely to cause great bodily injury, battery causing serious bodily injury," the two offenses based on the beating of Steward, which occurred on or about October 12, 2010. The jury was instructed that defendant and Shamir could be convicted of all three counts as either direct perpetrators or aiders and abettors.

However, the jury found both defendant and Shamir not guilty of counts I and II, assault and battery on Steward – the offenses which were alleged as the felonious criminal conduct for the violation of section 186.22, subdivision (a). In addition, Shamir was found not guilty of count III, active participation in a criminal street gang, but defendant was convicted of the same offense, even though the prosecution's gang expert testified that both defendant and Shamir had previously admitted their association with the ESC and 11th Street Project Crips.

The trial record suggests some reasons for the seemingly inconsistent verdicts on count III. Defendant testified before the jury that he was not involved in the beating of Steward; he held back "RJ" from jumping into the fight; he thought it was just a fistfight between Steward and Woods about their relationships with Shadonna; and he did not realize how badly Steward was beaten. In the course of his testimony, however, defendant admitted that he had been previously associated with the 11th Street Project Crips, but insisted that he was not with any other gang members that night, and that he was no longer involved in the gang.

The jury's second question about count III appears much more important in light of defendant's trial testimony, and the jury's decision to find both defendant and Shamir not guilty of the beating of Steward. The jury asked:

> "Clarification on Pen. Code 186.22(a)[.] The 'and' #3 does this only apply to October 10-13 or is his past allowed to be considered[?]"

The court correctly deduced that the jury's question was about the third element in CALCRIM No. 1400 to prove a violation of section 186.22, subdivision (a) – that

32.

defendant willfully assisted, furthered, or promoted felonious criminal conduct by gang members. The court's answer may have seemed relatively innocuous when it said that the jury could "use past history" to determine if defendant and/or Shamir "met the elements needed for the Oct 12 offense." Indeed, the jury may have properly relied on the gang expert's testimony about the prior contacts between defendant and law enforcement which established his association with the ESC, particularly his claim of ESC membership when he was booked into jail for this case. In addition, when the court replied to the jury's questions about the CJIS exhibits, it also stated that the "gang allegations require information regarding gang activity and *past gang information*." (Italics added.)

The court did not clarify that the jury could not rely on defendant's prior gang conduct to prove the "felonious criminal conduct" element of count III. As we have explained, "[i]t is not enough that a defendant have actively participated in a criminal street gang at any point in time, however. A defendant's active participation must be shown at or reasonably near the time of the crime." (*Garcia*, *supra*, 153 Cal.App.4th at p. 1509.)

The court's responses, however, also allowed the jury to rely on defendant's *prior gang conduct* to prove the "felonious criminal conduct" element of count III. Defendant admitted that he previously belonged to a gang. The prosecution's gang expert testified about defendant's prior gang contacts. While such evidence may have been relevant for the third element of the substantive gang offense, section 186.22, subdivision (a) does not criminalize mere gang membership, and "membership alone in a particular gang is not sufficient to satisfy the requirement of active participation." (*Garcia*, *supra*, 153 Cal.App.4th at p. 1509; *Gardeley*, *supra*, 14 Cal.4th at p. 623; *Castenada*, *supra*, 23 Cal.4th at p. 747.)

The court thus failed to explain that the jury could not rely on defendant's prior gang contacts to convict him of violating section 186.22, subdivision (a). As we have

explained, "[i]t is not enough that a defendant have actively participated in a criminal street gang at any point in time, however. A defendant's active participation must be shown at or reasonably near the time of the crime." (*Garcia*, *supra*, 153 Cal.App.4th at p. 1509.) The jury was instructed pursuant to CALCRIM No. 1400 that the "felonious criminal conduct" required to convict defendant of count III, the substantive gang offense, was based on the assault and battery on Steward. But the jury found defendant not guilty of the assault and battery of Steward, thus leaving defendant's admission of his prior gang status as the only evidence in support of his conviction for violating section 186.22, subdivision (a).

We conclude that the court's responses to the jury's two questions were erroneous because it advised the jury that it could convict defendant solely based on his gang membership and prior history, even if it found him not guilty of the assault and battery of Steward. We also find that the court's responses were prejudicial under any standard of review, given the nature of the evidence and the verdicts in this case. Furthermore, we find that to the extent defense counsel was ineffective for failing to object to the court's responses to the jury's questions, that failure to object was prejudicial for the same reasons. Defendant's conviction in count III must be reversed.[15]

Finally, the Attorney General concedes that if this court reverses count III based on the court's misdirection of the jury, then defendant cannot be retried for violating section 186.22, subdivision (a), since "the prosecution did not present other evidence of felonious criminal conduct," given the jury's not guilty findings on the assault and battery.[16]

---

[15] Given our reversal of count III, we need not address defendant's remaining issue.

[16] We note that *Rodriguez*, *supra*, 55 Cal.4th 1125 raises the question as to whether defendant's conviction for the substantive gang offense would have been valid regardless of the court's misdirection of the jury. Even if the jury convicted defendant of violating section 186.22, subdivision (a) because it believed that defendant was somehow

## **DISPOSITION**

The judgment of conviction and sentence imposed for count III are reversed.

 

 

_____
Poochigian, Acting P.J.

WE CONCUR:

 

_____
Franson, J.

 

_____
Pena, J.

---

involved in the beating, and that he aided and abetted either Woods and/or RJ as they assaulted Steward, such a belief might have satisfied defendant's willful promotion, furthering, or assistance of "felonious criminal conduct," but it would have left him convicted as a lone gang member, since Shamir was acquitted of all counts, and Woods and RJ were not charged in this case.

*Rodriguez* held that section 186.22, subdivision (a) "reflects the Legislature's carefully structured endeavor to punish active participants for commission of criminal acts done collectively with gang members." (*Rodriguez*, *supra*, 150 Cal.Rptr.3d at p. 545.) While *Rodriguez* involved a *single* gang member, charged and convicted of committing an offense by himself, the court addressed violations of section 186.22, subdivision (a) in broader terms: "The plain meaning of section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member. (See § 186.22, subd. (i).)" (*Rodriguez*, *supra*, 150 Cal.Rptr.3d at p. 539.) "As such, with section 186.22(a), the Legislature sought to punish gang members who acted *in concert* with other gang members in committing a felony regardless of whether such felony was gang-related. [Citation.]" (*Id.* at p. 544, italics in original.) We need not address this issue given the court's prejudicial misdirection of the jury, and the People's concession that defendant cannot be retried for violating section 186.22, subdivision (a).